OPINION
{¶ 1} T. B. appeals from his adjudication as a juvenile delinquent by reason of having committed acts that would constitute Rape and Abduction if committed by an adult. T. B. contends that the trial court erred when it denied his motion to suppress statements, both oral and written, he gave to police officers, both in his home, before warnings were given pursuant to Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and later, at the police station, after Miranda warnings were *Page 2 
given. We conclude that the post-Miranda-warnings statements were knowing and voluntary, so that the trial court did not err by denying T. B.'s motion to suppress them. As for the pre-Miranda-warnings statements, we note that the State did not offer these, exculpatory statements in evidence, but that T. B. sought, and obtained, their admission in evidence. Therefore, T. B. has waived any error in that regard.
 {¶ 2} T. B. also contends that his adjudication is not supported by the evidence in the record. Although his assignment of error is couched solely in terms of the evidence being insufficient, his argument in support of this assignment of error includes an argument that his adjudication is against the manifest weight of the evidence. We conclude that the testimony of the alleged victim is sufficient to support the adjudication, and that her testimony, combined with T. B.'s recanted admission to the investigating police officer that he persisted after the victim told him to stop, renders T. B.'s adjudication not against the manifest weight of the evidence. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 3} On August 22, 2006, S. W. went to T. B.'s apartment between 6:00 p.m. and 7:00 p.m. S. W. and T. B. were both seventeen years old. Initially, they were alone in the residence, but at one point, T. B.'s sister came in, accompanied by a friend and a cousin, D. K. They left later.
 {¶ 4} T. B. and S. W. watched a Dave Chappelle DVD, while sitting together on a couch in the living room. At some point, T. B. grabbed S.W. and had her sit in his lap. This was consensual, and the mood was "playful." When T. B. started touching *Page 3 
S.W.'s breasts, over her clothing, she told him that she had sustained a burn in that area, showed him a burned portion of her arm, and asked him to stop. He complied.
 {¶ 5} According to T. B., he asked S. W. if she would like to have sex with him, and she said, "yeah." She denied that this exchange occurred, but both T. B. and S. W. agree that they went upstairs to T. B.'s bedroom, consensually, and that "we were like all in a playing mood when he was taking me up there." S. W. testified that she was not scared at this point.
 {¶ 6} S. W. sat on T. B.'s bed, and he sat next to her. T. B. began kissing S. W., who testified that she was not scared at this point. Eventually, S. W. got up and went to the door, but T. B. blocked the doorway. S. W., laughing, told T. B. to let her out.
 {¶ 7} S. W. went back and sat on T. B.'s bed. T. B. pushed her arms back, lay on top of her, and kissed her. S. W. testified that she told T. B. to stop, but she admitted that she was laughing while she told him to stop, and she was still not scared at this point. He did not stop.
 {¶ 8} According to S. W., T. B. untied her capri jogging pants, which was easily done, they fell down, and he began rubbing his penis against her panties, where her "private parts" were. She bit him on the arm, and he said, "that shit don't hurt me." S. W. then started sliding off the bed, telling him to stop, and he said, "I see you like it on the floor." By this point, S. W.'s mood was no longer playful — she was upset.
 {¶ 9} T. B. did desist from the sexual contact, but he would not let S. W. out the door to his bedroom, despite several attempts by her to beat him to the doorway. While she was trying, unsuccessfully, to leave, S. W. told T. B.: "I ain't playing. I'm not going *Page 4 
to be your friend no more. I ain't coming here no more. You can't come over my house. Don't call me. And he said, well, anything I should have did or something? And I was like, well, no, you wouldn't have did nothing."
 {¶ 10} S. W. described what happened next as follows:
 {¶ 11} "Q. After you tried to get out, what happened?
 {¶ 12} "A. He was holding the door, said I wasn't going to get out if I wasn't going to be his friend and stuff.
 {¶ 13} "Q. Did you try to move him out of the way?
 {¶ 14} "A. Yeah.
 {¶ 15} "Q. How?
 {¶ 16} "A. Moving him, but — and then I had sat on the bed. I was like, I want to go, let me go.
 {¶ 17} "Q. I'm sorry. I couldn't hear you.
 {¶ 18} "A. I had sat on the bed and I told him that I wanted to go, and then I get back up — and he had like come towards me, and I get back up, and then he would block the door again. So I — I don't remember exactly how I ended up on my stomach on the bed.
 {¶ 19} "Q. Okay. You were sitting on the bed. He was blocking the doorway?
 {¶ 20} "A. Yeah.
 {¶ 21} "Q. And then what happened?
 {¶ 22} "A. I had got up and he had come towards — when he was coming towards me, I would get up and he would block the door again, and then I sat back on *Page 5 
the bed.
 {¶ 23} "Q. Okay. And when you sat back on the bed, what happened?
 {¶ 24} "A. He came towards me again. It was like we kept doing the same thing back and forth.
 {¶ 25} "Q. Okay.
 {¶ 26} "A. And I really don't know how I end up on my stomach. I really don't remember.
 {¶ 27} "Q. Okay. So at some point you end up on your stomach?
 {¶ 28} "A. Yeah. So he had my hands pinned down like this (indicating).
 {¶ 29} "Q. So you're laying on your stomach?
 {¶ 30} "A. Yeah, bent over on the bed, though, on the bed.
 {¶ 31} "Q. And where is [T. B.]?
 {¶ 32} "A. Behind me, and he undo my pants, and then it just fell straight down, my pants did. And then he had my arms like this, and I'm like, get off of me, whatever. And he just moved my panties over and he kind of — he forcing hisself [sic] inside of me, forcing his penis inside of me.
 {¶ 33} "Q. And hold on one second.
 {¶ 34} "And how do you know that he was forcing his penis inside of you?
 {¶ 35} "A. `Cause he hurt it.
 {¶ 36} "Q. And what happened next?
 {¶ 37} "A. And then I start — I was telling him to get off of me, and then that's when, I guess when he ejaculated or whatever. He stopped, and then he seen that I *Page 6 
was crying or whatever, and then he start crying. And like then he start asking me, like, did I hurt you or whatever.
 {¶ 38} "Q. And what did you say?
 {¶ 39} "A. And I couldn't say nothing because I was shocked, and I was just sitting there crying and crying, and `cause I wanted to go home.
 {¶ 40} "And then he was like — then he kept on asking me, did I hurt you, did I hurt you, do you feel — then he asked me did I feel that he raped me, and I still didn't answer. Then he asked me again, and I had told him, yeah. And then that's when he started to cry and stuff, like saying that he was sorry and stuff and he didn't mean to hurt me.
 {¶ 41} ". . . .
 {¶ 42} "Q. And then what happened?
 {¶ 43} "A. He was standing there. He was like, I'm sorry, I didn't mean to hurt you, [S.], and he was just talking about he didn't want to go to jail and stuff. And I was just sitting there and I couldn't really say nothing yet, and if I wouldn't have stopped crying, he wouldn't probably let me go home, because I was just sitting there crying because I couldn't just believe he did it, as cool as we was.
 {¶ 44} "Q. And then after you stopped crying, what happened?
 {¶ 45} "A. I — he was just standing there. I was crying and I'm just telling him, I said, I want to go home. I said, let me go home. And he just still was holding me and stuff and was like, you the only good friend I have, and stuff like that. And I just kept on saying, just let me go home, I just want to go home. And then he was like-
 {¶ 46} "Q. Were you dressed at this point? *Page 7 
 {¶ 47} "A. Yes.
 {¶ 48} "Q. When did you get dressed?
 {¶ 49} "A. After, I was pulling my pants up.
 {¶ 50} "Q. And were you able to get out of the room?
 {¶ 51} "A. He was holding me — well, he wasn't — it was like he just was grabbing me and saying sorry and stuff.
 {¶ 52} "Q. How did you — how did you get out of the room?
 {¶ 53} "A. Told him what he wanted to hear."
 {¶ 54} T. B. then walked with S. W. the short distance to her street, about a five-minute walk, and waited at the corner while she entered her home.
 {¶ 55} S. W. called an ex-boyfriend and told him what happened. He told her to call the police. S. W.'s brother, noticing that she was upset, asked her what was wrong, and she told him. He told their mother, and their father was involved. S. W. showed her father where T. B. lived, and her father called the police. Police talked to S. W. and to T. B., separately, that night, and got statements from each.
 {¶ 56} T. B. testified that he and S. W. had consensual sex in his bedroom, and that he walked her home afterward. He denied that either had cried at any point. He said that the bite mark on his arm was the result from having been bitten much earlier by the mother of his child, another female. He denied having asked S. W. if she thought he had raped her. Both T. B.'s initial statement to police, given at his home that night, and his first statement given the next day at the police station, were consistent with this testimony. In a second written statement given the next day at the police station, he acknowledged that S. W. cried after they had had sex, and he acknowledged that he *Page 8 
had asked her if she felt like he had raped her.
 {¶ 57} After T. B.'s second written statement at the police station, he was asked to respond, in writing, to three written questions. These questions, and T. B.'s written responses, are as follows:
 {¶ 58} "1. Did you hit [S.] to have sex with her? No.
 {¶ 59} "2. When you started having sex with [S. W.] did she tell to stop and no, but you though [sic] she did not mean it? Yeah.
 {¶ 60} "3. When did [S. W.] start crying? After."
 {¶ 61} A delinquency complaint was filed alleging that T. B. was delinquent by reason of acts that would constitute Rape, Gross Sexual Imposition, and Abduction, if committed by an adult. T. B. moved to suppress all the statements he gave to the police. Following a hearing, this motion was denied.
 {¶ 62} Following a trial, the juvenile judge found that the acts constituting Rape and Abduction had been proven beyond reasonable doubt, but found that the act constituting Gross Sexual Imposition had not been proven beyond reasonable doubt. The trial court committed T. B. to the Department of Youth Services for a minimum period of twelve months on the Rape adjudication, and for a minimum of six months on the Abduction adjudication, to be served concurrently. From the adjudication and commitment order, T. B. appeals.
 II {¶ 63} T. B.'s First Assignment of Error is as follows:
 {¶ 64} "THE TRIAL COURT ERRED BY OVERRULING DEFENDANT'S *Page 9 
MOTION TO SUPPRESS STATEMENTS."
 {¶ 65} Although T. B. sought to suppress all of the statements he gave to the police, we note that the State did not offer the statements he gave to the police at his home in the early morning hours after the alleged offenses. Because these statements were both exculpatory, and consistent with the later exculpatory statement and with T. B.'s trial testimony, it is not surprising that T. B. offered his written statement, given at his home, in evidence at the trial. This statement was admitted in evidence without objection by the State.
 {¶ 66} Under these circumstances, any error in the trial court's having overruled the motion to suppress these statements, made at T. B.'s home shortly after the alleged offenses, cannot have been prejudicial, and any objection to the admission of the written statement is invited error, and therefore waived.
 {¶ 67} T. B. does not dispute that he was given the warnings required by Miranda v. Arizona, supra, before he gave oral and written statements to Phillip Olinger, the investigating police officer, at the police station the next day. Written warnings, in accordance with Miranda v.Arizona, signed by T. B., were admitted in evidence. This form specifically indicates that: "You are being interviewed in regards to the crime of Rape." T. B.'s initials appear immediately after the word "Rape," at this part of the form.
 {¶ 68} Detective Olinger testified that T. B. appeared to understand the form, and the rights referred to in the form. T. B. had completed eleven years of schooling, and did not appear to be suffering from any form of mental handicap. T. B.'s mother went to the police station with him, and according to Olinger, consented to the interview. She *Page 10 
had no objection to T. B.'s being questioned alone by Olinger, after Olinger explained to her that matters of a sexual nature were going to be discussed.
 {¶ 69} T. B. did not testify at the suppression hearing. T. B. testified, at trial, that Olinger told him that he could get counseling, in lieu of jail, if he would just give a statement consistent with S.W.'s statement. But also T. B. testified that Olinger advised him to tell the truth, throughout the interview. Olinger denied having made any promises to T. B., and also denied having suggested that T. B. make any statement other than the truth.
 {¶ 70} Olinger admitted, both at the suppression hearing and at trial, to having told T. B., falsely, that S. W. was in the hallway. Olinger told T. B. this as a predicate for asking him if, should S. W. be brought into the interview room, T. B. would confront her, or apologize to her. Olinger also admitted having told T. B. that a DNA test could establish that S. W. had been crying, as she had claimed. T. B. testified, at trial, that Olinger told him that S. W. had passed a polygraph examination, but Olinger denied this.
 {¶ 71} In its written, post-trial decision, the trial court found Olinger to be a more credible witness than T. B.
 {¶ 72} The trial court found T. B.'s statements to the police to have been knowing and voluntary. We conclude that there is evidence in the record to support this finding. T. B.;s First Assignment of Error is overruled.
 III {¶ 73} T. B.'s Second Assignment of Error is as follows: *Page 11 
 {¶ 74} "THE TRIAL COURT ERRED IN FINDING CONVICTIONS BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO CONVICT DEFENDANT OF RAPE AND ABDUCTION."
 {¶ 75} Although this assignment of error is framed in terms of the sufficiency of the evidence, T. B.'s argument in support of this assignment of error includes an argument that his delinquency adjudications for Rape and Abduction are against the manifest weight of the evidence.
 {¶ 76} As to the sufficiency of the evidence, the testimony of S. W., alone, supports both delinquency adjudications. According to her testimony, if believed, T. B. had sexual conduct with S. W. through purposely compelling her to submit by force, which is Rape, a violation of R.C. 2907.02(A)(2). By having prevented S. W. from leaving his room, for the purpose of raping her, T. B., by force, restrained her liberty under circumstances creating a risk of physical harm to her, which is Abduction, a violation of R.C. 2905.02(A)(2).
 {¶ 77} In arguing that his adjudication is against the manifest weight of the evidence, T. B. argues that the trial judge, as the finder of fact, lost his way, because the trial judge should have credited his testimony, and not that of S. W. Perhaps the strongest argument T. B. makes in this regard is the fact that S. W. did not scream or bang on the walls, despite the fact that the apartment complex in which T. B. lived was heavily populated.
 {¶ 78} In her written statement to the police, made at the hospital, S. W. said that she was screaming during the assault, but she admitted at trial that although she was yelling at T. B. to get off of her, she was neither screaming, nor yelling loudly enough *Page 12 
that someone outside T. B.'s room would be likely to hear.
 {¶ 79} The fact that S. W. did not scream, or yell loudly enough to attract the attention of someone outside, is a point in T. B.'s favor, which he argued to the trial court as fact-finder. The trial court nevertheless found S. W. to be a credible witness. We must defer to the trial court, who was present to see and hear S. W. when she testified.State v. Lawson (August 22, 1997), Montgomery App. No. 16288,1997 WL 476684. As S. W. described the assault, it transformed very quickly from consensual activity in T. B.'s bedroom, in which her mood was "playful," to a non-consensual situation. Indeed, as she described events, the actual rape occurred suddenly, with her pants being untied, which was easy and quick, while she was lying on her stomach on the bed, and her panties not even being removed, but being pushed to the side, with T. B. entering her from behind. S. W. said that she was shocked by this sudden turn of events, not having believed that T. B., with whom she was friendly, would do that. Under these circumstances, we can understand how the Rape was accomplished before S. W. could completely comprehend what has happening, and react to it by appealing to outside forces, as a victim with more time to react might have been expected to do.
 {¶ 80} After her having been raped was an accomplished fact, S. W.'s attention and concern turned to getting home as quickly as possible, and she explained that it became clear to her that this required her to gain T. B.'s trust that she would not report him.
 {¶ 81} The trial court decided not to credit T. B.'s testimony. Again, we must give substantial deference to the finder of fact, who was present to see and to hear T. B. testify. State v. Lawson, supra. T. B.'s credibility suffered from the obvious problem *Page 13 
that his later statements to the police were inconsistent with his trial testimony, his testimony was inconsistent in several substantial respects with Olinger's testimony (whom the trial court found to be a credible witness), and T. B.'s answer to the second written interrogatory from Olinger admitted that he had persisted after S. W. had told him "no," having believed that she did not really mean "no."
 {¶ 82} In short, we conclude that the trial court did not lose its way, and that the judgment of the trial court is not against the manifest weight of the evidence. T. B.'s Second Assignment of Error is overruled.
 IV {¶ 83} Both of T. B.'s assignments of error having been overruled, the judgment of the trial court is Affirmed.
 BROGAN and DONOVAN, JJ., concur. *Page 1